at all, argument not to exceed 15 minutes per side. Mr. David Kearney, you may proceed for the appellant. Good morning. Good morning, your honors. Dave Kearney on behalf of the Deravil appellants. I would like to reserve four minutes for rebuttal. Very well. May please the court. I find as I advance, my mind tends to wander more than it used to. I don't know. I thought it was supposed to go the opposite way, but it hasn't, at least for me. I've bucked that trend. I was getting ready yesterday, and I found myself on merriamwebster.com, and I was looking up the definition of the term parent, and merriamwebster.com defines the term parent in two ways. One that begets or brings forth offspring, and second, a person who brings up and cares for another. Our clients are not the child A.D.'s parents in the first way that Webster's uses that term. Our clients are A.D.'s parents in the second way that Webster's uses that term, in terms of being the ones that actually did the job. Unless I'm missing something, that's really not an issue in this appeal, is it? Correct, Judge. There's no dispute about that. For eight years in Martinique, we raised the child A.D. as our own. So while we're wandering, maybe we should wander back to the issue. And I think the issue is related to that, Judge, which is the issue is that once that happens, when you have the wrongful retention, when you have what we have here, which is a situation where we raised A.D. as our own for eight years, and what happened in Columbus . . . The primary patient case handles that, so why not . . . To me, the whole issue revolves around the district judge's finding of the exception to the Hague Convention, or however you want to say about the maturity and the decision of the child. What you're asking us to do is pretty difficult, which is find clear error in a district judge's finding who sat there, talked to the kid, looked them in the eye, saw their demeanor. You're asking us to look at a cold record and find that. Tell us how we can do that. Well, there's a couple of things there, Judge Thaper. First of all, from our perspective, the standard of review is not clear. The standard of review is de novo, because this was decided on summary judgment. There's no weighing of facts on summary judgment. That's what the court held . . . One way we could find it is coaching, and the district court found she wasn't coached. You're saying that's a legal conclusion? I'm saying when you're deciding a motion for summary judgment . . . I understand we do that all the time, but we have to . . . You have to view the facts in the light most favorable to us, and that wasn't done here. This was, I think, this was separate from the summary judgment, where all of a sudden there was this in-camera interview that took place, but the weighing, the viewing of the facts and the summary judgment standard as applied was not applied to us here. The other thing that I will say, and moving on from that, there's no requirement, and this is where I will take issue with your question to some extent, because there's no requirement in the convention that the exceptions be applied at all. They're not mandatory. They are . . . It makes sense, but the district judge does have the ability to apply the exception. The district judge did an in-camera review and applied the exception here, correct? Correct, correct. That, to me, is the whole case. It comes down to that, it seems to be. I'm not disagreeing with you in that respect. To me, the whole case is you send the kid back. That's what our obligation is under the treaty. That's the decision you want, but what we have to decide is whether the district court erred in applying that exception. There's a legal question and there's a factual question. That's where . . . I will get to that, don't worry. I think I disagree with you on the you have to decide. I think you could exercise your discretion. Article 18 of the convention gives this court the authority that, notwithstanding anything else in the convention, Article 18 gives the authority to the court to order the return of the child at any time. I agree with you, Judge Thapar. Obviously, this was the basis on which the district court here denied our petition, but I do want to challenge, respectfully challenge that basic premise that the court needs to reach this. Going on to that . . . If we don't have to reach the age and maturity exception, then what would be our basis to second guess the district judge in order to return here? What do we look at in your mind? To my mind, you look at what is the purpose of the convention. What did this court . . . This court, we're not writing on a blank slate in Friedrich. The whole core premise of the convention is that a parent does not benefit from exactly what the appellees did here. This is one of the congressional findings. It's now 22 U.S.C. 902A2. Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention. You're 100% right, but there's an exception. I'm struggling with how we can just ignore what the district court did. I don't see . . . I mean, show me in the Hague convention where it says you can ignore what the district court did. It doesn't seem like you can just do that. Give me a case that does that, that says we recognize the district court found X. We don't need to find clearer. We don't need to reverse the district court. We can just do what we want. I don't know that the . . . You know, Monaskey, I'm not sure how . . . I mean, the Supreme Court just . . . Founding from this, the Supreme Court said, here's what we're going to do. I agree. The one thing, I will address what you're saying. To me, if you go to your point, Judge Thapar, the transcript to me, when you're talking about what the age and maturity exception is and what the exceptions to the convention are, they are narrow. They're only supposed to be applied in the most . . . This court in Friedrichs said, extraordinary cases. I look at that transcript, Judge. I don't see this as an extraordinary case. I look at the district court's analysis, and this is page ID 17-20-22, and page 40 of the district court's opinion. He's looking at . . . Here's what the district court itself is saying. Look at demeanor. Understanding the difference between the truth and a lie. Ability to recall and narrate. Understanding the purpose and significance of the proceedings. I don't see any of that in the transcript. We didn't have this transcript until after the district court issued its decision. We were not given the opportunity to brief the application of the exception in the district court. What happened when you get to Ohio? This is page ID 17-20-22. Did you ask for an opportunity to file supplemental briefs after the transcript was made available to you? The decision was already done by that time, Judge. It'll help us if you just say yes or no, if you can. No, we did not, Judge. Did you ask for reconsideration once you got the transcript to point out what you're pointing out to us now that, hey, Judge, what you found in your order doesn't seem to be consistent with the transcript? We did not, Judge. We did not. We filed the appeal. How about just for a moment, we assume that clear error applies. And we assume that we're talking about the exception here. So aside from the transcript, for which you make good arguments about why it supports your side, is there anything in the record from your side that we should look at that indicates that she is not of sufficient age or maturity? It's a good question, Judge. Your clients raised this child for eight years, so obviously they know her. Yeah. So did they put anything into the record? Our clients would say, I don't know what's in the record, but what they would say is the transcript doesn't reflect AD. It doesn't reflect what they know of her. And I think that... Where do we look to find that? Judge, David, something they provided from her health care provider, her teachers, her friends, whoever it was. Is there any of that in the record? I think the transcript on its own speaks for itself. Okay. So all we're left with is the transcript. And sort of back to Judge Thapar's question, how do we second guess that his conclusion that he drew when he's the one that conducted the interview under a clear error standard, whether you agree with clear error or not? Yeah. And well, the other thing I'd point to, Judge, and I'll get your sides, is the deposition testimony too that talked about from Elise and from LeGrand. The other thing, if we go to clear error, I know I'm running out of time. The district court made an error legally in how it interpreted in the convention under four, Brondon, DaSilva, Tesai, and Custodio, four circuit courts of appeal has held a stricter standard must apply when the age and maturity alone exception is a law. What does that mean on review? What do we do with a stricter standard? I think in the typical case, you'd remand and have the district court apply the correct legal standard, but... The question is, what does that standard mean? I mean, the other circuits do say that when the case is decided on the age and maturity exception, a strict standard should be applied. But in practicality, what does that mean? I think if you go back to the Brondon opinion, Judge, and it's 166 of the Brondon opinion, it's talking about the different... And there it was a grave risk and a challenge to considering an eight-year-old's testimony on the grave risk. And they said, no, we can consider an eight-year-old's testimony on the grave risk. And we can consider, too, an eight-year-old's testimony on the age and maturity exception. There's no bright lines here. But if the age and maturity exception alone is the sole basis for denying the petition, then a stricter standard has to apply, which to me means the testimony has to be more compelling. Okay. Does it mean it has to be clear and convincing? Or it has to be compelling? You say it has to be compelling. Do the other circuits use that language? The other circuits have not defined it in that way. I think appellees are right there. Have they defined it at all? They have said the stricter standard must apply. I know, but have they defined that? Not that we've seen, Judge, but I think... In three of these cases, I got the impression that the stricter standard requires you, the child, to make an objection as opposed to making an objection. Am I wrong in that assessment, in your opinion? I agree with your assessment there. I think they might be two different things. I think an objection... You can't tell us what the other thing is. I think it's up to this Court, in some respects, to start defining it. I don't think it's necessarily defined in the other ones, but I think this Court can look at this testimony here, in this case, and say, whatever it is, this does not meet that stricter standard. Or, at the end of the day, we could also remand to the District Court to apply this standard in the first instance, which would be the typical thing. I say stricter standard must mean something more than an objection, because the Hague Convention, Article 13, states, and I quote, the District Court may refuse to order return if the child objects and has attained an age and degree of maturity at which it's appropriate to take into account its views. So the objection is already in the Hague Convention, so stricter standard must mean something in addition to objection. Agreed. And the other thing is, we do have a standard of review here, even if it's clear error. That's not a rubber stamp, is it? Agreed, Judge. Just like we review things for abuse of discretion all the time, that's not a rubber stamp either, isn't it? No, it's not. We do have a role of reviewing, and the fact that a District Judge will make a fact finding, we still review that, don't we? Correct, Judge. Okay. Yeah, and that's where I turn to that page of the District Court's opinion, where to me, where that clear error, where the abuse of discretion, where it's right, is. I mean, the judge here made his findings, but do his findings have to be supported by record evidence to be sustainable? Yes, yes. Okay, and your argument is the transcript doesn't provide that record evidence to support his conclusion under a clearly erroneous standard. That's correct, and the other argument is on summary judgment, and that's the Sun America case we cite in our reprisal brief. On a motion for summary judgment, there are no findings. There are findings, aren't there? Isn't the in-camera interview, isn't that, I mean, that's a record, and then there's findings based upon that interview, isn't it? I mean, we do have findings here. It is unusual for summary judgment, but actually, I think in other contexts, you can have a hearing on summary judgment and resolve issues occasionally. It's not the norm, but I think it does happen once in a while. Okay, thank you. You'll have your rebuttal, which is four minutes. Thank you. May it please the court. Good morning.  For a court to conclude that there's clear error, this court has colorfully and helpfully said that that decision has to strike you with the pungence of a five-week-old unrefrigerated dead fish. It's a helpful standard. Is that the strict standard we ought to apply, the dead fish standard? I think it is, because I think what it speaks to is that clear... I thought the strict standard is our application of the exception should be strictly applied, and I think your quote about the dead fish kind of goes opposite to a strict application of the exception, doesn't it? No. I'm describing the standard that has to be met to find there was clear error in the court's fact... That might be under ordinary review, but how about under a strict review? Well, by strict review, you mean the review that has been proposed by the appellants. I presume that's... Well, it's been adopted by, what, four other circuits? Well, no one knows what this is. Well, it has been adopted by the mat, hasn't it, even if it's ill-defined? Your Honor, if a court doesn't tell us what it means, I don't know how to apply it. Can I ask a follow-up? Griffin suggested, at least in a question, I'm not saying he suggested this is his view, clear and convincing. What's wrong with that? And then we could view clear error through that lens. In other words, ordinarily, it's a preponderance of the evidence. One way to make it stricter is to say it has to be clear and convincing. If that's the case, then clear error gets easier than the dead fish, right? Because then a district court has to meet a certain threshold. And so now it's like a sliding scale. I'm literally making this up on the fly. I heard him say clear and convincing, and I'm interpreting it. So what's wrong with that? Well, I think that the burden of proof that was required for the age and maturity exception was preponderance of the evidence. So I guess we would start there. I understand. I'm trying to come up with a way to interpret what the circuits mean by stricter standard. Well, the circuits don't tell us. I think that's the point. They use the word. And I think that I kind of default back to maybe what Judge McKee was saying, that somehow, when a child is expressing an objection, it has to be specific, not a mere preference. That to me sounds like what they're trying to say when there should be a stricter standard for age and maturity exception. And I'm struggling with this case, just to be candid. But here's my problem, is some of the questions that were asked of her, like, do you know what the hearing is about? Yes. What's it about? I don't know. By the same token, the same child said to a different question, she understood it was part of this case. Now, the fact that the 13-year-old didn't understand exactly what this case was about is not surprising. But at least she had the presence of mind to understand that this was a significant step in this process. So that's a counterpoint within that transcript. And I would suggest that her recital, that she had been beaten with a stick. What about the fact, the Third Circuit pointed out that the length of time the person is under the custody of the parents in country can influence that. Your friend on the other side points it out in their brief. Here, by my calculation, tell me if I'm wrong, it was two years between when you wrongfully kept the child and when the child testified. I don't think it was two years. Well, there were two moments of inquiry. One was with the medical professionals that happened in January of 2025. Five months later, the trial judge interviews her. And she came in the summer of 23, is that right? That's correct, yeah. So June of 25 is two years, right? Or a little less than two years from when you wrongfully kept her. I point out the original exam with the medical professionals because she recited the same concerns about physical abuse there. But she also testified, or told the judge, that she did not feel that she fit in in Martinique and that she was afraid of these people. Well, the court found that to also be a form of emotional displacement among the specific facts that supported these convictions. Can I ask an unrelated question? How should we take account of the fact that TPS ends February 3rd? A, will we have jurisdiction after February 3rd, and B, should we be comparing Martinique in that sense to here or to Haiti? Well, to your first question, our clients are also going through the application process for asylum. And my understanding is that their status is therefore separate from TPS. So whatever may or may not happen with respect to TPS I don't think has any particular impact on our clients. And it's true that history may overtake a lot of things in this case, but what we have before us right now is a decision to make about whether this trial court adequately, and I would argue that he eloquently, articulated what this child's objections were and faithfully applied all the requirements that the cases had set forth for the application of the age and maturity exception. Did he say why he concluded that she has the age and maturity to make this decision? I thought it was just conclusory. Well, no. In the decision, he starts with specifically identifying the things he looked at for her age specifically. And he did recite in there that she knew the difference between the truth and a falsehood. She hadn't been coached. Her testimony was consistent with what she had said to the medical professional. She had the ability to recite some of the things that had happened to her. And so I don't think it was conclusory. I think he was summarizing his conclusion based on those specific facts. And those facts are within that transcript. So I come back to his decision, to your first point, your latest point, Judge Griffin. The court made those findings. He then turned his specific attention to the objections. And in addition to the beating, in addition to the threat. Well, she also, she was asked, did anything bad happen to you in Martinique? And she says, no, nothing bad happened to me. So I know that there was some testimony that the, she may have been a victim of abuse. She may have been beaten at one time with a stick. But anything bad happen? No. Well, I would suggest, your honor, that somebody beat me with a stick. I said, that was pretty bad. Well, but that's not what she said. No, she said it was, nothing bad happened. Well, a 13 year old in an extraordinary moment was able to recite that she was beaten with a stick. That's important. The court found that important. Court also found important. Am I wrong that she asked the question, did anything bad happen to you in Martinique? And her answer was no. Is that correct? That's right. Oh, okay. And she said other things too. That's really all I asked you. Well, let's put it in context.  Other things that she said. I'm struggling here. You know, she's in Ohio and she likes Ohio. And Ohio's much better than Martinique. And we're trying to decide if she just prefers being in the United States as opposed to be in Martinique, as opposed to the custodial arrangement. And is there preference to be in the United States? And... Well, I think that it's fair to say that she said both things. She expressed specific objections, including physical violence, which is significant, emotional displacement, which other courts also consider. She also said she preferred to be here. Both things can be true at the same time. And here, the district court, who had the ability to look at her and evaluate her demeanor, concluded that beatings were a significant objection. Emotional displacement was a significant objection. Yes, she may prefer to be with her parents who don't beat her. I would feel exactly the same way. But both things can be true at the same time. But neither of those things, or the fact she may have a preference doesn't undermine the specificity of her objections. And so the court also acknowledged, or took the position that my clients had engaged in self-help as the court looked at the equitable considerations it was required to consider. And the court, in effect, held that we're not going to punish the child to make an example of the parents. And I think that the statement the court made was... It was eloquent. He said, returning a child to punish or retaining custodians prior malfeasance does not seem to be in the spirit of the Hay Convention, particularly when such return disturbs the child. The court respects A.D.'s desire to remain in the United States with her biological parents and siblings. It credits her independent, authentic, and mature objection to returning to the Derevels in Martinique. The court said it hesitates in the face of this defense to punish the Jean-Louises by ordering A.D.'s return at the cost to A.D. herself. And at the heart of the convention is the welfare of these children. So in this unusual case, this case is not like the rest, it kind of breaks the mold. The court made the judgment based on all the evidence and considering all the arguments that were coming from the appellants that the equities favored recognizing this child's specific objections. So from that perspective, it's hard to look at the record and the judge's conclusions and say that somehow this was so wildly inconsistent with what he heard that he deserves to be reversed on this. Quite the contrary, I think this decision reflected the fact that- One thing I struggle with is the parents say she was kidnapped, which I find kind of, I'm suspicious of that to say the least because they are, for eight years didn't complain. They didn't, they say, okay, we didn't complain to Haiti because they wouldn't do anything. They moved to Chile, they came to the U.S. And if it was kidnapped, why'd they voluntarily send her here? Like it seems to me, I hate to say it, I'm looking at this record and I can't tell who's telling the truth. Well, actually, you can. And so I agree with you. We have two narratives here, but we have some undisputed facts. Our appellants have admitted that the statements on the birth certificate that they used to justify their custodial rights were false. They lied when they said that LeGrand Dareville was the biological father of this child. He admits that's not true. He lied when he said that he gave her her name. That's not true. Don't we have to treat that document as accurate under the Hague Convention? Well, you can treat the document as accurate, but here, under the laws that the court has, the court has the obligation to look at the evidence before it, including the admissions of the parties. I understand, but the child was gone for eight years without you all doing anything. Well, I understand. So I have this very sort of first world complaint. You're talking about the possibility of a family in Port-au-Prince, Haiti, prosecuting an international case in Martinique to try to return a child. They were in Haiti, then they were in Chile, then they were in the U.S. It's not like they spent all eight years in Haiti. Well, it would be no more doable for them to prosecute living in Haiti or Chile or anywhere else. The fact of the matter is that this child was taken into this country, admittedly into Martinique, admittedly under false pretenses, and my clients, who unfortunately are part of the international diaspora, had no real ability to prosecute anything to get them back. That seems to me to be one of the most, you know, astonishing kinds of allegations. The suggestion that somehow... If your child is kidnapped, you're not going to do everything in your power? That strikes me as odd. I don't buy into just because we're of a certain class or from a certain country, we don't love our children so much that we would do anything for them. They're clearly fighting it to this court to do it because they love their child. So what was... If they're claiming it was kidnapped, that's what I find to be, like, false. It seems to me you would do anything in your power to get back a kidnapped child. Well, I would respectfully suggest, Your Honor, that that's exactly what they did. As Jelmice testified, they concluded the only thing they could do was maintain a relationship with this family so that they would have some ability at some point to stay connected with their child. But otherwise, what would they do? What would you do? I mean, if I were in the same position, I might have the ability to hire a lawyer in Martinique to start this process. I might have the ability to... I don't know. They went to Chile. Why didn't they go to Martinique? I mean, like, your child's there. Yeah, well... They left and went to Chile. Yeah, the flow of the immigrant community wasn't to Martinique. That's why. They had other connections in Chile, and they could not stay in Port-au-Prince. That's life in Haiti. If I could take us in just a slightly different direction in the small amount of time you have left, unless Judge Tapar wanted to follow up. No, no. One thing I'm curious about is I had a number of these cases when I was a district judge. We had an en banc case involving the Hague Convention here in this court. But all the cases that I had in my limited experience involved very young kids. Some so young that they couldn't express an opinion. It was hard to figure out where their habitual residence was. Here, it's odd, in my experience, to have a kid as old as this one is, who's now two years older. This kid's getting pretty close to an age of majority, at least in this country. I have no idea what that would be in Haiti or Martinique. So is that something that we take into consideration here in evaluating age and maturity, or is it irrelevant? I think it's always relevant. I think under the convention, at age 16, they can simply make a choice without going through this particular process. And how close is this child today? She's 14 today. I thought she came here in 13, and you were saying this took two years. She was 13 at the time she was interviewed by the court. I think she turned 14 since then. She was 11 when she came here, right? I think that's right. She's approaching that age. And I think it does matter that a child, even at the age of 13, can clearly express opinions. I know my kids certainly could when they were 13. They may not always have been as articulate as one might have hoped. But certainly this child was able to do it, and those statements exist in the transcript that you have before you. I've read the transcript probably two or three times, and she has difficulty answering the most basic questions. And then sometimes she contradicts herself. I mean, that is the record I have to review, to see if that record supports the district court's findings. But don't you read that transcript the same way I do, that a lot of these questions, they're very simple, basic questions. She's just unable to answer them? Well, I read that transcript through the lens of what I've experienced in these cases. So we have a 13-year-old who has proficiency in English. She's not necessarily fluent. We have a creole interpreter. There's also a translator there if they need it. And the judge, I assume, if he thinks there's a translation problem, would ask the translator to intervene. Instead, just a basic question, and she'll say, I don't know, I don't know, throughout the transcript. I mean, it's incredible. If I may, Your Honor, I'd like to answer your question. Please. There's always a translation challenge when you've got a question, you have a remote translator, they provide answers back. It's very difficult to establish communication in these cases with our clients always. So it's not surprising that you may have seen some of those stumbles. But what we don't get to see is how that child was actually responding and behaving in front of this trial judge. I have the transcript, and that's the record I have. And we have, I mean, we are not a rubber-stamp court. Whether it's abuse of discretion or clear error, those standards of review mean something. It's not just that we affirm the district court's finding for every case. And to affirm it, there has to be record evidence to support it. I mean, it's incredible how many questions she has no idea and she cannot answer. And if it's a translation problem, I would think the district court should have pointed that out on the record to let us know that, okay, it's not her lack of knowledge, lack of maturity, lack of information, it's a translation. But he doesn't do that. And the district court had the opportunity to do it. The fact remains that she did provide the answers that support the judge's decision. And now the risk that you're running is you're simply going to second-guess because the cold record doesn't provide the same animation as the in-person experience that judge had. Also, the judge asked a lot of leading questions, too. He was implying the answers, and then she would come around and give the answer to the leading question that the judge posted to her. Answers that were consistent with what she told medical professionals five months before. Five months before. And a court who concluded that she hadn't been coached by her parents. Well, I think he asked her if they had talked to the parents, and she said she had. And then I think their leading question, and they didn't coach you, did they? No, they didn't coach me. What did they say to you? I don't know. They actually had talked to her before the hearing, obviously. Okay, you're out of time. Any further questions, Judge McKeague? No, thank you. Thank you, Reynolds. All right, to rebuttal, I think we have four minutes. Thank you, Judge. I'll pick up. I think Judge McKeague, going back to the objection versus preference point here, at the end of the transcript, I think it answers that. Can you put some meat on the bones? To Judge Griffin's point, the district judge had to ask, can you put some meat on those bones? No. Anything bad happen to you there? No. You would prefer to stay in Ohio. I've had six 13-year-olds live with me, and getting them to answer any question at all is difficult. Getting them to elaborate and follow up is almost impossible. How was your day today? Fine. What did you do today? Nothing. Was school okay? Yes. So if you put this in the context of, at least in my experience, a typical 13-year-old, what do you see is out of the ordinary of a normal 13-year-old here? I would say the same thing I see is what Judge Griffin is saying, is the contradictory answers, the inability to narrate, the inability to answer questions. I'm trying to figure out what is it that you see in this transcript, that you see in the transcript, that's unusual for a 13-year-old. I am with you. I have two teenage girls at home, Judge. If you want them to talk, if you ask and you continue to follow up, and they'll say, how was school? Fine. I'll get that same thing. Why was it fine? How was it fine? What happened at school? You can get them to talk. It's just normal conversation, and you'd have to press, but here the judge presses and nothing happens. Can you put some meat on those bones? Anything bad happen to you there? No. You would prefer to stay in Ohio. Yes. At the end of the day, Judge McKeith, it came down to a preference, and regardless of anything else, anything else, a preference is not sufficient under the convention. Can I ask you, because to me it came down to a couple things. It came down to the alleged abuse, which I know LeGrand denies, and the preference, plus that she wants to be here. I guess that's just the preference. How do we factor that in? Because the district judge heard that. I don't know that he decided about the abuse. I think he said she alleges it, he denies it. He moved on, or it's somewhere in the middle, or something like that. I think this is where, to some extent, too, it goes to that stricter standard, and I agree, Judge McKeith. The stricter standard is something that I think does need to be developed. But the grave risk exception exists for cases of abuse. Sending the child back under 13B would subject the child to a grave risk of harm. Can I ask you, what is your view of the stricter standard? Because I still haven't gotten a concrete answer to that question. That's fair. I think, to me, the one thing I will say to your point, Judge Thapar, the preponderance of the evidence standard is in the ACARA for age and maturity. It's clear and convincing for grave risk. Not to cut against myself, but just so you know that. Thank you. I appreciate that. Then how do we figure out what stricter standard means? I think, again, what we cited in our brief is like actual malice in a public figure defamation case. You're saying, okay, strict scrutiny in a First Amendment case. We deal with these stricter standards in all these different contexts, and it's just applying one here where we have this age and maturity exception as the sole basis. To me, it's just a thumb on the scale, like in a First Amendment case, where you have strict scrutiny versus intermediate scrutiny. This is what I'm struggling with. If it was pure preponderance, clear error, just to be candid, I don't think it's hard for me to say he committed clear error because he could watch her, he could see her demeanor, all the things we can't tell from a cold record. Where I struggle is how does the stricter standard factor into that? Where does it come from? How does it factor in? How are we supposed to determine it? Even in looking at the other circuits, I don't know that they really explain it in a meaningful way. I would go back to SADA versus Golan is the Supreme Court's case, most recent hate case. And SADA is just saying we're dealing with the interpretation of a treaty, and it's dealing with the grave risk and protective undertaking, amelioratory measures under the grave risk. But Judge Sotomayor, in analysis, says, hey, we're just dealing with the interpretation of treaty. A treaty is a contract between nations. It's the interpretation of a contract. And so here, when you're talking about what standard or how we develop the standard, I think it does go to, all right, we've got to protect the grave risk. Grave risk you have to show by clear and convincing under ACARA. And here, we've got to not muddy the waters between the two. And so the stricter standard, if anything, has to mean to protect the grave risk. If anything, it has to mean in a case where we're dealing age and maturity alone, but allegations of abuse in there, the allegations of abuse themselves at least have to be clearing, almost very convincing evidence of that. I think that's where it's we're balancing a lot here. I agree, and the standard is something that I agree with Judge Greer. It's not necessarily in the cases, but I think we can develop it. All right. The other restriction we have is the age and maturity exception to the prima facie case under the Hague Convention, which I guess is not incontested now. I think it's conceded that the Hague Convention's prima facie case is satisfied here, and the only thing we've got is the age and maturity exception. I think our case law says it's a narrow exception. What does that mean, a narrow exception? I think that's what it goes to. The whole thing of the convention is you want to return the child. So all of these exceptions are to be narrowly construed. As opposed to broadly construed? As opposed to broadly construed. These are extraordinary circumstances is what this Court said in Friedrich first. It's got to be extraordinary. It's got to be extraordinary. That's what the Court held. And real quick, as with the other third, this is the State Department's kind of 51-FR-100510. The application of the exception is not mandatory, and again, it's supposed to be narrow. Narrow and strictly construed?  Yeah. All right. We're way past our time, but any further questions? No. Mr. McKeague? No. Mr. Parr? Thank you. Thank you very much for your arguments. The nature of the case, we will do our best to expedite a decision on this case. But thank you. The case will be submitted.